1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KHALIFAH E.D. SAIF'ULLAH,

11           Petitioner,              2: 09 - cv - 3356 - MCE TJB

12       vs.

13   JOHN W. HAVILAND,

14           Respondent.          ORDER, FINDINGS AND

15                                RECOMMENDATIONS

16   _____/

17                    I.  INTRODUCTION

18       Petitioner, Khalifah E.D. Saif'ullah is a state prisoner proceeding *pro se* with a petition

19   for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a

20   sentence of seven years to life imprisonment following his 1980 conviction of kidnapping for

21   ransom.  Petitioner does not contest his conviction in this federal habeas petition.  Instead his

22   habeas claims relate to the denial of parole by the Board of Parole Hearings (the "Board") in

23   September 2008.  Petitioner also argues that has been subjected to religious persecution while in

24   prison.  Finally, Petitioner asserts his Constitutional rights were violated at two prison

25   disciplinary proceedings.  More specifically, Petitioner lists his federal habeas claims as

26   follows:  (1) he is being denied his liberty interest to parole because there is not "some evidence

1

to substantiate that he is a current risk of danger to society ("Claim I"); (2) the use of two prison disciplinaries to deny him parole did not constitute the requisite "some evidence" of his current dangerousness to society ("Claim II"); his constitutional rights were violated when the Board used illegally obtained evidence which resulted in his prison disciplinaries which were used to deny him parole ("Claim III"); (4) he has been subjected to malicious prosecution by the Board ("Claim IV"); (5) he has been subjected to religious prosecution while in prison ("Claim V"); (6) the reasons used by the Board to deny him parole constituted a violation of his due process and equal protection rights as the reasons given did not meet the requirements of "current dangerousness" to deny Petitioner parole ("Claim VI"); (7) his positive efforts over the years while in prison support his suitability for parole ("Claim VII"); (8) the Board has altered his sentence to one of life without the possibility of parole in violation of the Ex Post Facto Clause by denying him parole ("Claim VIII"); and (9) the decision by the Board in 2008 to deny him parole was predetermined and decided before the actual hearing ("Claim IX"). For the following reasons, the habeas petition should be denied.

## II. FACTUAL[1] AND PROCEDURAL HISTORY

> [O]n August 12, 1978, Petitioner and Co-Defendant approached a couple in the parking lot of a hospital. Petitioner, with a gun, and Co-Defendant robbed the couple of their jewelry, wallet and purse. Co-Defendant also struck the wife breaking her nose. Petitioner and Co-Defendant then took the couple's car keys and fled the scene in a different vehicle. The next day, Petitioner was caught using the couple's stolen credit card and questioned.

> On September 26, 1978, Petitioner approached the victim, Kenneth Cohen, at Cohen's work location. Petitioner pointed a gun at Cohen and forced Cohen back into his car. Another Co-Defendant, whom Petitioner met while previously in prison, was also present. Cohen was tied up in the back seat and the three drove to an apartment building where Cohen was held captive. Cohen was chosen as the victim because Co-Defendant, a friend of Cohen's family, knew that the family recently came into $100,000.

---

[1] The factual history of Petitioner's underlying conviction is taken from the Superior Court of California, County of Los Angeles opinion dated April 6, 2009 and attached by Respondent to his answer as Exhibit B (hereinafter the "Slip Op.")

Petitioner and Co-Defendant planned to ask for $60,000 in exchange for the safe return of Cohen.  Petitioner and Co-Defendant forced Cohen to record a ransom tape stating that he was fine and to give his captors anything they wanted.  The tape was intended for Cohen's family.  Cohen was then injected with a drug to make him sleep.  The next day, Cohen managed to escape while Petitioner was out telephoning Cohen's family.  Cohen led police to the apartment and Petitioner was arrested.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on September 8, 2008.  The Petitioner was denied parole for two years.

(Slip Op. at p. 1-2.)  In denying Petitioner parole, the Board stated the following:

[T]he panel reviewed all information received from the public and from you and relied on the following circumstances in concluding that you are not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  And this finding of unsuitability is based on weighing the considerations in the California Code of Regulations Title 15.  On September 26, 1978 at approximately 1730 hours the victim, who was Kenneth Cohen, arrived at his work location.  And after he parked his car, the inmate approached him, threatened him with a gun and ordered him into his car.  A co-participant also got into the car.  The inmate drove and the victim was tied up in the backseat.  After driving for approximately 20 minutes, they stopped in an apartment building and the victim was told to go in and sit down.  This crime was carried out in a dispassionate and calculated manner in that once inside the inmate and his partner tied up the victim, holding him captive and forcing him to make an audio tape to send to his parents saying he was okay and to give the offenders anything they wanted.  This victim was abused in that he was injected with some type of drug that the inmate told the victim would make him sleep.  Demonstrating callous disregard for human suffering, the inmate and the co-partner then left the apartment.  The victim was able to untie himself and get out of the house by using a knife to release the door hinges.  The victim reported the crime to the police and led law enforcement officers to the apartment where he thought he'd been kidnapped, identifying the inmate as one of the suspects.

This inmate has an extremely serious criminal history that includes violence, assaults and prior criminality with an escalating pattern of criminal conduct.  This inmate has suffered juvenile probation, juvenile parole, time in the county jail.  He's had a CYA commitment, prison commitment and commitment to camps and he has skipped bail.  As a juvenile, this inmate had a history of arrest, robbery, burglary, auto theft, possession of marijuana and weapons.  The inmate reported he was first arrested at 12 years old

for stealing a bicycle.  At 15 years old he was sent to a juvenile camp for a month.  At 17 years old he was sent to CYA for armed robbery.  When the inmate and other wards were discovered in possession of marijuana, he was given an additional year at the California Youth Authority.  Discharged from parole in 1976, the inmate was already in adult custody.

The inmate has an extensive history of arrests as an adult.  His first arrest was for burglary where the inmate and an accomplice stole a TV from an elderly woman's home.  The inmate initially denied involvement in most of the crimes for which he was arrested but later admitted his involvement.  On March 25th, 1976 the inmate was committed to state prison for burglary first and paroled on October 12th, 1977.  Following parole, the record shows a three year history of robbery, burglary and forgery arrests, eventually ending with his arrest for the two robberies and the controlling offense.  At the time the inmate was tried for the commitment offense, he was also convicted of two counts of armed robbery in Los Angeles and San Mateo counties and received prison sentences.  The first robbery was of an elderly couple in Los Angeles.  According to police reports, the couple was leaving a restaurant when the inmate and his accomplice accosted them and forced them into their vehicle at gunpoint.  They took the victim's money, jewelry, watches, wallets and credit cards.  The co-participant broke one victim's nose by hitting her in the face with his gun as she tried to flee the car.  The inmate was arrested when he tried to use the victim's credit card to buy stereo equipment.  The second robbery took place at a restaurant bar in Palo Alto.  The inmate and a co-participant entered a bar, sat down and requested change.  When the waitress attempted to make the change, the offenders order the employees and the customers to the floor at gunpoint and stole money from the cash register.  The inmate was given seven years for the Los Angeles armed robbery and nine years for the Palo Alto crime.

[Petitioner] has spent 28 years in prison.  The inmate reported that he started drinking alcohol at 15 to 16 years of age and that he started smoking marijuana at about the same time, eventually smoking a joint a day.  In the past, the inmate has claimed he has not used since 1986.  Today he said it was 1980.  The inmate has been married four times, twice while in prison.  This inmate has a GED and he's taken programing in the Career Development Institute.  He's a Certified Paralegal by his own testimony today.  He has received exceptional work reports as the Islamic Clerk but he's currently unassigned.  A number of chronos were read into the file regarding his religious positions and as a caretaker in the chapel.  This inmate has never achieved a vocational certification save for his paralegal training.  This inmate has been – claims to be on the wait list for self-help, but otherwise he has no upgrades in the self-help area whatsoever.

4

The inmate has a total of 17 serious disciplinary violations, including the two most recent in 2007 for business dealing by an inmate, operating a paralegal business inside the institution.  And the panel did note the inmate's 1987 drug trafficking 115, especially in view of his lack of self-help and his claim that basically he has no issues with drugs.  This inmate also has 17 128(a)s.  And normally these are not even mentioned because they are counseling chronos.  However, it is notable that the inmate's most recent 128(a) is in 2007 and that was for excessive physical contact, which most frequently is adjudicated as a 115.  But the pattern that is shown by the plethora of 128(a)s, 17 of them, indicates further the inmate's failure to be able to follow the rules, and they are very simple rules, inside the prison setting, in addition of course to his 115s or serious disciplinary violations.  So up until very recently this inmate had continued to display negative behavior in prison.

As to the psychological report, the most current, using the psychometric instruments which are now standard for the Forensic Assessment Division, the report, having been done on September 12, 2007 by Dr. Jatinder Singh . . . Dr. Singh notably opines under insight that [Petitioner] does not view himself as a criminal, and that in fact is the tenor that this inmate expressed during today's hearing.  He views himself as an individual who didn't consider consequences and repeatedly followed the direction of older individuals, making some very bad decisions.  In fact, the clinician further opines that he minimizes the role of his own decision making and his criminal activity, including the commitment offense and did not, with the clinician, discuss his behavior with other victims.

As to diagnostic impressions, the clinician diagnosed this inmate on Axis I with alcohol Abuse By History and Cannabis Abuse by History and on Axis II with Antisocial Personality Disorder and Narcissistic Personality Disorder, both of which the Panel feels they witnessed displayed today.  This inmate was diagnosed on Axis V by the clinician with a Global Assessment of Functioning of 80.  Under the psychopathy checklist revised, the inmate was assessed to be in the moderate to high range of psychopathy.  Under the HCR-20, in the moderate – under moderate risk of committing another violent crime.  And according to the LS/CMI he was placed in the high category, indicating his risk to recidivate generally.  Overall, the clinician assessed his inmate as being in the moderate range for both violent and nonviolent offenses if released into the free community.  The Panel did weigh this – the psychological report by Singh.  I should also note for the record, this report, standby, this report was reviewed.  It was not done in isolation.  It was reviewed by Dr. Steven Walker, senior psychological at the Forensic Assessment Division, Board of Parole Hearings.  And he did indicate that – that a new psychological evaluation was not warranted for the current hearing,

1   that Dr. Singh's September 2007 report is a timely diagnostic
    assessment of the inmate's psychiatric status and observations as to
2   the inmate's progress and both current and estimated future
    violence.  The Panel did note this inmate's responses to the report
3   and made them a matter of record.  But the Panel does not feel they
    were of the substance that would change their conclusions as
4   regard to this report.

5   As to parole plans, the inmate has indicated that if paroled he
    would live with his wife, Nahbooba Nasheer Saifulla, in
6   Sacramento.  And he did present the Panel with a letter from his
    wife indicating that he would live with her.  He claims being
7   offered, according to the Board report, two different positions from
    the same employer, Mr. Sam Toplean.  And we did in fact have a
8   letter from that gentleman indicating that he would offer him a job
    with Earth Station Auto Repair.  There was just the one job that the
9   Panel noted in the current letter.  The inmate also indicated that he
    would plan to be self-employed as a paralegal in which he appears
10  to have the training to do so.  As to Penal Code 3042 responses,
    responses indicate opposition to the finding of parole suitability,
11  specifically by the District Attorney of Los Angeles County.

12  In a separate decision, the hearing Panel finds it's not reasonable to
    expect that parole would be granted a hearing during the following
13  two years.  Specific reasons for this finding are as follows.  First,
    the commitment offense.  The Panel did consider the commitment
14  offense and does incorporate by reference the details of that crime
    as presented in the probation officer's report, pages 6 through 8,
15  noting that this was a very callous crime.  It was planned and the
    inmate and the co-partner did in fact put this – this individual
16  under a great deal of emotional stress as well as some physical
    stress whenever they forced him to submit to some type of
17  injection, some type of drug that the inmate claimed would make
    the victim sleep.  Fortunately, the victim was not killed.  He
18  fortunately was able to escape, get away and fortunately for society
    also he was able to lead police back to his attackers.  Further
19  indication of the planning that went into this crime was that while
    he was held captive the victim was told that the family had been
20  watched for approximately 18 months.  The captors demanded
    $60,000 ransom.  The victim was also photographed by his
21  kidnappers and his stepfather received two phone calls requesting
    to speak to the victim's mother.  The inmate initially lied to police
22  about his involvement in the crime, but the nexus between this
    crime and today, which this Panel weighed very heavily and is very
23  concerned about, is that this crime was the culmination of a long
    pattern of very serious criminal history that this – this inmate has.
24  And then the inmate has come to prison and he's continued to fail
    to obey the rules of – in the prison setting.  And the inmate's
25  attitude toward his criminality, which he seems to refuse to
    acknowledge as continuing criminality, is that basically – and he
26  expressed it himself.  You, sir, said I don't see helping someone as

                                    6

1   a violation of the law.  It appears, sir, that you've given yourself
    permission to violate the law at will.  And the Panel found it very
2   interesting in looking through all the documentation we have,
    noting that back at the time of the probation officer's report, the
3   probation officer commented, on November 13, – and I quote the
    probation officer's report, this is page 10.
4
    "November 13, 1979, he was found guilty of two counts of armed
5   robbery, given a sentence – seven year prison sentence.  He still
    has another case pending for robbery in Santa Clara County,
6   California.  It appears that nothing, including probation and parole
    supervision and incarceration, impresses this defendant.  As soon
7   as he's released from jail, he's almost immediately involved in
    another crime.  Despite efforts to supervise him in the community
8   and redirect him into more constructive paths, he chooses the
    lifestyle of the criminal.  He has no work history that can be
9   verified and no skills or realistic employment prospects if released.
    He does not admit guilt in this matter as in the past with other
10  charges he's been involved in.  Therefore, there's no reason to
    believe that this pattern of behavior that's well established by the
11  defendant would ever change."

12  Now, the Panel is concerned, seriously concerned because that –
    that statement was not meant to be totally predictive.  It would be
13  hoped that after years of incarceration this inmate's attitude and his
    ability to obey the rules would have changed.  But it apparently has
14  not.  And as recently as 2005 at his hearing, Commissioner Welch
    commented, he said, you need to work on your attitude, continue to
15  work on your attitude.  And he says, we're just looking at your last
    115, your contempt for authority.  You talked about it a little bit.
16  And Commissioner Welch said that your – your attitude expressed
    and I quote Commissioner Welch:
17
            "You can't tell me what to do.  Well, you get in the
18          community and nobody can tell you want [sic] to do
            because you just totally ignore the norms, the laws
19          of society out of YA or camp and prison.  Nobody
            out there can tell you what to do either, so that's
20          why you're here in prison and that's why you got to
            – demonstrating ina structured environment that
21          you've got it, that you can program.  You've got to
            put some distance between that.  You've got to
22          continue to put distance."

23  And sir, your attitude has continued to this day, because you have
    continued to ignore the rules.  As recently as 2007 you have two
24  serious 115s.  And these are very serious, because they involve the
    safety and security of the institution.  That's basically what those
25  rules are about.  They're not about you per se.  And they're
    certainly not biased against you.  You seem to have the attitude that
26  there is some conspiracy or some general feeling against you

                                    7

1   because you have chosen the path of Islam.  And that's certainly
    not true, Sir.  The Panel sees that for what it is – appears to be,
2   which is an excuse to minimize your behavior.  And you really
    have minimized those 115s.  And that's alarming.  Because again,
3   these are serious 115s.  We can't underscore that enough.  And the
    fact that you only view them as helping someone out and you don't
4   understand what the purpose of the – of the rules are and you just
    mainly walk over them and refuse to – to follow them just carries
5   on this tradition that you have defined throughout your career,
    refusing to follow the rules.  That's – That makes it impossible for
6   us to parole you at this time, because you remain a serious risk to
    society.  If you go out with the same attitude and you run
7   roughshod over the rules of society, you'll be right back in.  You'll
    be in trouble again.  So it's very important that you – that you do
8   look at this very seriously.  Also today, sir, the Panel heard nothing
    in terms of your testimony about any remorse for the victim,
9   Kenneth Cohen.  It was totally lacking today.  Your attorney said
    you have remorse, but frankly we didn't hear that expression from
10  you.  He suffered quite a bit, and this is the reason that we've
    basically come here today, and yet he didn't really play a very
11  major role today.  But he was the one that was the victim.

12  (Pet'r's Pet. Ex. E, at p. 52-63.)

13          After Petitioner was denied parole by the Board in September 2008, he filed a state

14  habeas petition in the Superior Court of California, County of Los Angeles in January 2009.  In

15  that state habeas petition, Petitioner raised the same claims that he raises in this federal habeas

16  petition.  The Superior Court of California, County of Los Angeles denied Petitioner's state

17  habeas petition in a written decision on April 6, 2009.  Petitioner then filed a state habeas petition

18  in the California Court of Appeal in April 2009 raising the same issues.  The California Court of

19  Appeal summarily denied the state habeas petition on April 30, 2009.  Petitioner then filed a state

20  habeas petition in the California Supreme Court which raised the same issues.  The California

21  Supreme Court summarily denied the state habeas petition on October 28, 2009.

22          Petitioner filed the instant federal habeas petition on December 2, 2009.  Respondent

23  answered the petition on April 1, 2010.  Petitioner filed a traverse on April 21, 2010.  The matter

24  was reassigned to the undersigned by Chief Judge Ishii on August 23, 2011.

25                      III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

26          An application for writ of habeas corpus by a person in custody under judgment of a state

8

1   court can only be granted for violations of the Constitution or laws of the United States.  See 28

2   U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v.

3   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

4   Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

5   and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

6   320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

7   decided on the merits in the state court proceedings unless the state court's adjudication of the

8   claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

9   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

10  resulted in a decision that was based on an unreasonable determination of the facts in light of the

11  evidence presented in state court.  See 28 U.S.C. 2254(d).  Where a state court provides no

12  reasoning to support its conclusion, a federal habeas court independently reviews the record to

13  determine whether the state court was objectively unreasonable in its application of clearly

14  established federal law.  See Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

15          As a threshold matter, this Court must "first decide what constitutes 'clearly established

16  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade,

17  538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

18  under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

19  at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

20  application clause, a federal habeas court making the unreasonable application inquiry should ask

21  whether the state court's application of clearly established federal law was "objectively

22  unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

23  not issue the writ simply because the court concludes in its independent judgment that the

24  relevant state court decision applied clearly established federal law erroneously or incorrectly.

25  Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court

26  law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

9

1    determining whether a state court decision is an objectively unreasonable application of clearly

2    established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

3    the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

4    applied, we may look for guidance to circuit precedents.").

5                              IV.  ANALYSIS OF PETITIONER'S CLAIMS

6            A.  Claims arising from Parole Denial

7                    i.  Claims I, II, IV, VI and VII

8            Claims I, II, IV, VI and VII all center around the decision of the Board to deny Petitioner

9    parole.  Petitioner takes issue with the Board's findings within these Claims.  By way of

10   example, Petitioner argues that his due process rights were violated when the Board used an

11   erroneous psychological report as one of the reasons to deny Petitioner parole.  Petitioner also

12   objects to the Board's use of two prison disciplinaries as another factor in determining that

13   Petitioner was not suitable for parole at the time of the September 2008 parole hearing.

14   Petitioner argues that he has a liberty interest in parole and that the reasons cited by the Board in

15   denying him parole did not meet the requirements of "current dangerousness."   Petitioner also

16   cites to the various positive factors that supported his parole eligibility.

17           First, to the extent that Petitioner relies on state law and the California state constitution,

18   those issues are not cognizable on federal habeas review.  See Estelle v. McGuire, 502 U.S. 62,

19   67-68 (1991) (stating that it is not the province of a habeas court to examine state law questions).

20   Nevertheless, Petitioner does not only rely on state law in his federal habeas petition.  The Due

21   Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life,

22   liberty, or property without due process of law.  A person alleging a due process violation must

23   first demonstrate that he or she was deprived of a protected liberty or property interest, and then

24   show that the procedures attendant upon the deprivation were not constitutionally sufficient.  See

25   Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 459-60 (1989).  The full panoply of rights

26   afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a

10

1    parole proceeding.  See Pedro v. Or. Parole Bd., 825 F.2d 1396, 1398-99 (9th Cir. 1987).  The

2    Supreme Court has held that a parole board's procedures are constitutionally adequate if the

3    inmate is given an opportunity to be heard and a decision informing him of the reasons he did not

4    qualify for parole.  See Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 16

5    (1979).

6         The landscape of a California state prisoner bringing a due process claim for a denial of

7    parole has changed with the recent United States Supreme Court decision in Swarthout v. Cooke,

8    131 S.Ct. 859 (2011) (per curiam).  Prior to Swarthout, the Ninth Circuit held that as a matter of

9    state law, denial of parole to California inmates must be supported by at least "some evidence"

10   demonstrating current dangerousness.  See Hayward v. Marshall, 603 F.3d 546, 562-63 (9th Cir.

11   2010) (en banc).  In its decision in Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010), rev'd by,

12   Swarthout, 131 S.Ct. 859, the Ninth Circuit had held that "California's 'some evidence'

13   requirement is a component of the liberty interest created by the parole system of the state."

14        Swarthout reversed the Ninth Circuit in Cooke.  The Supreme Court stated regarding a

15   California state prisoner's due process rights with respect to parole that:

16           Whatever liberty interest exists is, of course, a *state* interest created
             by California law.  There is no right under the Federal Constitution
17           to be conditionally released before the expiration of a valid
             sentence, and the States are under no duty to offer parole to their
18           prisoners.  When, however, a state creates a liberty interest, the
             Due Process Clause requires fair procedures for its vindication –
19           and federal courts will review the application of those
             constitutionally required procedures.  In the context of parole, we
20           have held that the procedures required are minimal.  In Greenholtz,
             we found that a prisoner subject to a parole statute similar to
21           California's received adequate process when he was allowed an
             opportunity to be heard and was provided a statement of the
22           reasons why parole was denied.  442 U.S. at 16.  "The
             Constitution," we held, "does not require more."  Ibid.

23

24   Swarthout, 131 S.Ct. at 862.  The Supreme Court continued by explaining that, "[b]ecause the

25   only federal right at issue is procedural, the relevant inquiry is what process [the petitioners]

26   received, not whether the state court decided the case correctly."  Id. at 863.

1    Pursuant to the decision in <u>Swarthout</u>, Petitioner is not entitled to federal habeas relief on

2  his Claims that the Board improperly denied him parole on the merits.  In this case, Petitioner

3  was given an opportunity to be heard at his parole suitability hearing.  He also was given a

4  statement of reasons why parole was eventually denied by the Board.  As the Supreme Court

5  stated in <u>Greenholtz</u> and reaffirmed in <u>Swarthout</u>, that is all that is required under the Federal

6  Constitution.  Additionally, Petitioner was also given the opportunity to go through his file

7  before the hearing.  Therefore, Petitioner's arguments as to the merits of the Board's decision

8  denying him parole within Claims I, II, IV, VI and VII of his federal habeas petition do not merit

9  federal habeas relief under these circumstances.

10    Within these Claims, Petitioner does not only rely on the Due Process Clause.  Petitioner

11  also cites to the Equal Protection Clause in arguing that his Federal Constitutional rights were

12  violated by the Board's denial of parole in September 2008.  (<u>See</u> Pet'r's Pet. at p. 25 ("Petitioner

13  contends that the reasons used by the Board of parole hearings to find petitioner a current threat

14  or danger to society and deny parole to petitioner was a violation of due process, *equal protection*

15  *of the law* and did not meet the requirements of current dangerousness according to precedent

16  case law and authority pursuant to the state and federal constitution.") (emphasis added).)   The

17  Fourteenth Amendment's Equal Protection Clause "is essentially a direction that all persons

18  similarly situated should be treated alike." <u>Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439

19  (1985) (citation omitted).  Petitioner can establish an equal protection claim by showing that he

20  was intentionally discriminated against based on his membership in a protected class, <u>see</u> <u>Lee v.</u>

21  <u>City of Los Angeles</u>, 250 F.3d 668, 686 (9th Cir. 2001), or that similarly situated individuals

22  were treated differently without a rational basis for the difference in treatment.  <u>See</u> <u>Village of</u>

23  <u>Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (per curiam).  To state an equal protection

24  claim under this second theory, Petitioner must allege that:  (1) he was intentionally treated

25  differently from others similarly situated; and (2) there is no rational basis for the difference in

26  treatment.  <u>See</u> <u>Engquist v. Oregon Dep't of Agric.</u>, 553 U.S. 591, 601 (2008).  In this case,

12

1   Petitioner fails to show that he was intentionally treated differently than others similarly situated

2   and he does not show that he was intentionally discriminated based on his membership in a

3   protected class.   For the foregoing reasons, Petitioner is not entitled to federal habeas relief on

4   Claims I, II, IV, VI and VII.

5                              ii.  Claim VIII

6           In Claim VIII, Petitioner argues that the Board has altered his sentence from seven years

7   to life to one of life without the possibility of parole by denying Petitioner parole.  Petitioner

8   argues that this violates the Ex Post Facto Clause.  Contrary to Petitioner's assertions, the Board

9   did not alter his sentence when it denied him parole at the September 2008 suitability hearing.

10  By denying him parole at that time, the Board did not deny Petitioner parole forevermore.

11  Petitioner remains eligible for parole at future parole suitability proceedings.  Therefore, as

12  Petitioner's sentence remains unchanged, there is no Ex Post Facto Violation.  Petitioner is not

13  entitled to federal habeas relief on Claim VIII.

14                             iii.  Claim IX

15          In Claim IX, Petitioner argues that he was denied an impartial Board panel.  The

16  California Court of Appeal and the California Supreme Court both summarily denied this Claim.

17  Therefore, the record will be independently reviewed to determine whether the state court was

18  objectively unreasonable in its application of clearly established federal law.  See Musladin, 555

19  F.3d at 835.

20          The Due Process Clause includes a "basic requirement" of a "fair trial in a fair tribunal."

21  In re Murchison, 349 U.S. 133, 136 (1955).  "Because parole board officials perform tasks that

22  are functionally comparable to those performed by the judiciary, they owe the same duty:  to

23  render impartial decisions and controversies that excite strong feelings because the litigant's

24  liberty is at stake." O'Bremski v. Maass, 915 F.2d 418, 422 (9th Cir. 1990) (internal quotation

25  marks and citation omitted); see also Schweiker v. McClure, 456 U.S. 188, 195 (1982) ("[D]ue

26  process demands impartiality on the part of those who function in judicial or quasi-judicial

                                          13

1  capacities."). "In attempting to make out a claim of unconstitutional bias, a plaintiff must

2  overcome a presumption of honesty and integrity on the part of decision makers " and "show that

3  the adjudicator has prejudged, or reasonably appears to have prejudiced, an issue." Stivers v.

4  Pierce, 71 F.3d 732, 741 (9th Cir. 1995) (internal quotation marks and citations omitted).

5        In support of this Claim, Petitioner cites to a Board hearing decision face sheet (see

6  Pet'r's Pet. at Ex. V.) which was purportedly dated two days before Petitioner's parole suitability

7  hearing which indicates that Petitioner would be denied parole. Exhibit V does not overcome the

8  presumption of honesty and integrity on the part of the Board. Instead, the record reveals that the

9  Board listened to all of the evidence at the parole hearing and issued a reasoned decision based

10  on the specific circumstances and facts in Petitioner's case in ultimately denying Petitioner

11  parole for two more years. See Gomez v. Small, Civ. No. 09-1972, 2011 WL 3563831, at *6-7

12  (S.D. Cal. May 31, 2011) (denying Petitioner's bias claim where commissioners considered

13  many factors in connection with petitioner's suitability for parole such that they made an

14  individualized assessment of the circumstances of petitioner's case), report and recommendation

15  adopted by, 2011 WL 3563877 (S.D. Cal. Aug. 12, 2011); Benda v. Cates, Civ. No. 09-2872,

16  2011 WL 1362105, at *4 n. 5 (C.D. Cal. Mar. 3, 2011) (noting that petitioner's claims of bias

17  were not supported by the record which indicated that the panel took into account specific facts

18  of petitioner's case and based its decision on individualized determination of parole eligibility)

19  (quoting Torricellas v. Davidson, 519 F. Supp.2d 1040, 1053 (C.D. Cal. 2007)), report and

20  recommendation adopted by, 2011 WL 1361537 (C.D. Cal. Apr. 8, 2011); Morris v. Mendoza-

21  Powers, Civ. No. 07-375, 2008 WL 4825927, at *5 (S.D. Cal. Nov. 5, 2008) (denying Board bias

22  claim by explaining that "[t]he Board offered a detailed rationale for denying Petitioner's parole

23  based on the particularized facts of his case. The Board properly considered Petitioner's social

24  history, his past and present mental state, his criminal history, his commitment offense, his

25  behavior before, during and after the crime, and his attitudes towards the crime.") (citing 15 Cal.

26  Code Regs. § 2402(c)). Thus, Petitioner fails to show that the summary denial of this Claim was

1    an unreasonable application of clearly established federal law.  Therefore, the Claim should be

2    denied.

3            B.  Religious Persecution - Claim V

4            In Claim V, Petitioner alleges that he has suffered religious persecution while in prison.

5    Specifically, Petitioner states that he is Muslim and that his parole suitability hearing took place

6    during the holy month of Ramadan.  Petitioner argues that he was not given a plastic cup during

7    the evening hours after the period of fast was over for the day.  Petitioner also states that he was

8    not given his evening meal on September 26, 2008.

9            Petitioner fails to state a cognizable federal habeas claim within Claim V.  Generally, a

10   prisoner's complaint that prison officials are violating the prisoner's First Amendment rights

11   must be brought in a civil rights action, not in a § 2254 habeas proceeding.  See Cobb v.

12   Mendoza-Powers, Civ. No. 08-1920, 2010 WL 364453, at *4 (C.D. Cal. Jan. 25, 2010) (citing

13   Muhammad v. Close, 540 U.S. 749, 750 (2004) (per curiam) ("Challenges to the validity of any

14   confinement or to particulars affecting its duration are the province of habeas corpus [;] . . .

15   requests for relief turning on circumstances of confinement may be presented in a § 1983

16   action."; Valdez v. Rosenbaum, 302 F.3d 1039, 1048 (9th Cir. 2002) (listing *inter alia,* First

17   Amendment religion free exercise claims cognizable in § 1983 civil rights actions); Katz v.

18   McGrew, Civ. No. 09-412, 2009 WL 3049635, at *2 (D. Haw. Sept. 23, 2009) (religious

19   accommodation claims must be brought as civil rights action and not in federal habeas petition);

20   Lucas v. Hartley, Civ. No. 08-1806, 2009 WL 1930063, at *1 (E.D. Cal. June 30, 2009)

21   (dismissing free exercise of religion claims under § 2254 stating that "these grounds are clearly

22   not candidates for habeas relief"); Beiruti v. Sugrue, Civ. No. 09-360, 2009 WL 902048, at *1

23   (E.D. Cal. Apr. 2, 2009) (dismissing a § 2241 petition and concluding that the prison's failure to

24   provide petitioner "with Muslim meals . . . concern[s] the conditions of Petitioner's confinement

25   and are claims more appropriately heard in a civil rights action")).  In this case, Petitioner's

26   religious persecution argument within Claim V relates to the conditions of his confinement, not

15

1  the fact or length of his confinement.  As such, this claim is properly raised in a civil rights

2  complaint rather than a federal habeas petition.  Therefore, Claim V should be denied.

3      C.  Prison Disciplinaries - Claim III

4      In Claim III, Petitioner argues that his Constitutional rights were violated during the

5  course of two disciplinary proceedings.  He asserts that the evidence used to find him guilty of

6  operating a business should have been excluded under the exclusionary rule because the evidence

7  used against him was improperly seized.  Petitioner was found guilty of two offenses of business

8  dealing by an inmate in violation of 15 Cal. Code Regs. § 3024[2] based on the evidence presented

9  on December 24, 2007 and January 8, 2008.  Respondent makes several arguments in response to

10  this Claim.  First, Respondent contends that because Petitioner has already served beyond his

11  minimum eligibility parole date and is already being considered for parole release, the prison

12  disciplinaries which penalized Petitioner thirty days good time credits each, could not be used to

13  shorten his confinement.  Thus, Respondent argues that Claim III does not warrant review in

14  these federal habeas proceedings.  Respondent also argues that the prison disciplinary findings

15  were supported by "some evidence."  Third, Respondent argues that Petitioner's mail did not

16  correspond with prison regulations and was not related to matters that his attorney was pursuing

17  on Petitioner's behalf, therefore it was not entitled to any Sixth Amendment protection.  Finally,

18  and somewhat connected to his first argument, Respondent contends that Petitioner is not entitled

19  to federal habeas relief on this Claim because vacating the prison disciplinaries will not impact

20  the fact or duration of Petitioner's confinement.

21      Because Respondent's first and fourth argument's address whether Claim III is even

22  cognizable in these federal habeas proceedings, they will be analyzed first.  Federal habeas

23  jurisdiction lies for claims that go to "the validity of the fact or length of [prison] confinement."

24

25     [2] 15 Cal. Code Regs. § 3024(a) states that "[i]nmates shall not engaged actively in a business or profession except as authorized by th institution head or as provided in Section 3104.

26  For the purpose of this section, a business is defined as any revenue generating or profit making activity."

See Pressier v. Rodriguez, 411 U.S. 475, 490 (1973).  To the extent that Petitioner seeks restoration of forfeited good time credits, Respondent's argument is valid as Petitioner has failed to state a cognizable claim for federal habeas relief.  Petitioner is serving an indeterminate life sentence with the possibility of parole and had already received parole suitability hearings at the time of the challenge prison disciplinary conviction.  The sixty days of time credits forfeited as a result of the two challenged prison disciplinaries had no bearing on the fact or duration of Petitioner's confinement because they neither extended his life term nor extended his minimum term.  See Calderon-Silva v. Uribe, 2010 WL 5392895, at *2 (C.D. Cal. Aug. 31, 2010) ("Petitioner is serving an indeterminate life sentence and first became eligible for parole consideration on November 17, 2003.  The 360-day time credit loss was imposed roughly four years later.  Accordingly, the punishment that resulted from the allegedly unconstitutional disciplinary proceedings has no bearing upon the fact or duration of petitioner's confinement because his term of life in prison was not extended and his minimum term of imprisonment was not shortened by the loss of time credits."), report and recommendation adopted by, 2010 WL 5423732 (C.D. Cal. Dec. 21, 2010).

However, Claim III also appears to assert that the findings of the two prison disciplinaries should be expunged based on the purported illegally seized evidence used to support the disciplinary findings.  Whether such a claim is cognizable under federal habeas review is complicated and is an issue that the district courts within the Ninth Circuit (as well as within the Eastern District of California) have decided differently.  Judge Brennan traced the Ninth Circuit cases that have created the differing opinions on the issue in Jackson v. Swarthout, Civ. No. 10-494, 2011 WL 3875859, at *4-6 (E.D. Cal. Aug. 31, 2011), report and recommendation adopted by, 2011 WL 4543192 (E.D. Cal. Sept. 27, 2011):

> Three Ninth Circuit cases are central to the controversy; Bostic v. Carlson, 884 F.2d 1267 (9th Cir. 1989), Ramirez v. Galaza, 334 F.3d 850 (9th Cir. 2003), and Docken v. Chase, 393 F.3d 1024 (9th Cir. 2004).  In Bostic, the court of appeals reviewed district court dismissals of ten separate habeas petitions filed by the same

petitioner, challenging nine prison disciplinary actions taken against him.  884 F.2d at 1269.  Prison officials had assessed a forfeiture of good-time credits for some of the infractions, but the remainder did not carry a loss of time credits – only a term of segregated housing.  Id. at 1269.  In each of the petitions, the petitioner sought expungement of the infractions from his disciplinary record.  Id.  The court "assume[d]" that habeas jurisdictions existed over all the petitions, even those challenging discipline with no attendant credit loss, stating:

> Habeas corpus jurisdiction is available under 28 U.S.C. § 2241 for a prisoner's claim that he has been denied good time credits without due process of law.  [citations] Habeas corpus jurisdiction is also available for a prisoner's claims that he has been subjected to greater restriction of his liberty, such as disciplinary segregation, without due process of law.  [citations]  Habeas corpus jurisdiction also exists when a petitioner seeks expungement of a disciplinary finding from his record if expungement is likely to accelerate the prisoner's eligibility for parole.  [McCollum v. Miller, 695 F.2d 1044, 1047 (7th Cir. 1982)].

Id. at 1269 (emphasis added).  The court did not elaborate on when expungement would be "likely to accelerate" parole-eligibility.  [FN 5]

> [FN 5]  Bostic spoke of "eligibility" for parole.  In California, release on parole is a two-step process – first, the prisoner must become "eligible" to be *considered* for parole (sometimes referred to simply as "eligibility") and, second, the prisoner must be found "eligible" to be *released* on parole (sometimes referred to as "suitability").  See Neal v. Shimoda, 131 F.3d 818, 824 (9th Cir. 1997) (highlighting this distinction for purposes of § 1983 challenge to Hawaii's Sex Offender Treatment Program).  It is unclear whether the Bostic panel's jurisdictional pronouncement was limited to claims likely to accelerate eligibility for consideration or covered both those claims and claims likely to accelerate eligibility for release, as both concepts can be covered broadly by the term "eligibility" and courts often do not distinguish between the two steps.  See The Free Meriam-Webster Dictionary entry for "eligible," http://www.merriam-webster.com/dictionary/eligable (last checked July 5, 2011) (defining "eligible" as "qualified to participate or to be chosen" and "worthy of being chosen").  The undersigned assumes, absent

18

definitive indication to the contrary, that the court intended that habeas jurisdiction exists both when success on the claim is likely to accelerate the date on which the petitioner becomes eligible for parole consideration as well as when success on the claim is likely to accelerate the date on which the petitioner will ultimately be found suitable for release on parole.  This assumption is consistent with the underlying purpose of the writ of habeas corpus, which is concerned with the petitioner's ultimate release.  So long as success on the claim is likely to accelerate release under Bostic, the court sees no reason to distinguish between "eligibility" and "suitability."

The court revisited Bostic's statements on habeas jurisdiction in Ramirez, 334 F.3d at 858-59.  In Ramirez, a prisoner brought a civil rights action under § 1983 rather than a habeas petition to challenge the procedures used in imposing disciplinary sanctions of ten days of disciplinary detention, 60 days loss of privileges (but no loss of time credits) and a referral to administrative segregation.  Id. at 952-53.  He sought expungement of the disciplinary record from his file and an injunction prohibiting the state from considering it "when they fix plaintiff's terms and decide whether plaintiff should be released on parole."  Id. at 859 n. 6.  The district court dismissed the case, finding it barred by Heck [v. Humphrey, 512 U.S. 477 (1994)]'s favorable termination rule after determining that success in the case would necessarily imply that the disciplinary finding was invalid.  Id. at 852.

The Court of Appeals reversed, holding that the favorable termination rule does not apply to prison disciplinary sanctions that do not necessarily affect the fact or length of a prisoner's confinement.  Id. at 854-58.  The court rejected the state's Bostic-based argument that the plaintiff's claim that his disciplinary hearing violated due process was "logically inseparable from an attack on the outcome of that hearing, and that a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction."  Id. at 859.  The court reasoned that the favorable termination rule applies only if success in the § 1983 action would necessarily imply the invalidity of a disciplinary finding and necessitate a reduction in the plaintiff's length of confinement.  Id. The state had failed to show that expungement of the disciplinary finding would necessarily accelerate plaintiff's release because the parole board could still deny parole on the basis of other factors.  Id. ("As Ramirez's suit does not threaten to advance his parole date, his challenge to his disciplinary hearing is properly brought under § 1983.)

In the course of its analysis, the court discussed Bostic in some detail:

19

Bostic does not hold that habeas jurisdiction is always available to seek the expungement of a prison disciplinary record. Instead, a writ of habeas corpus is proper only where expungement is "likely to accelerate the prisoner's eligibility for parole." Bostic, 884 F.2d at 1269 (emphasis added). . . . Bostic thus holds that the likelihood of the effect on the overall length of the prisoner's sentence from a successful § 1983 action determines the availability of habeas corpus."

Id. at 858. From this, the court made the following leap, assuming that the courts' jurisdiction over habeas petitions and their jurisdiction over § 1983 are mutually exclusive: "]H]abeas jurisdiction is absent, and a § 1983 action proper, where a successful challenge to a prison condition will not necessarily shorten the prisoner's sentence." Id. at 859 (emphasis added). For ease of discussion, this quote will be referred to herein as the "mutual exclusivity rule." This language has created uncertainty, because challenges to prison conditions that will necessarily shorten the prisoner's sentence fall squarely within the "core" of habeas jurisdiction identified in Preiser, and the Ramirez language indicates that only "core" habeas cases can be brought in federal habeas petitions. It is important to recall that Preiser simply held that "core" cases had to be brought in habeas petitions but did not hold that habeas jurisdiction was limited to such cases. However, Bostic – quoted with apparent approval by the Ramirez panel – squarely found habeas jurisdiction to exist in a non - "core" situation, where success would not necessarily spell earlier release, but was merely likely to accelerate parole-eligibility. Thus, Ramirez's mutual exclusivity rule quoted above appears inconsistent both with the opinion's prior reliance on Bostic for the proposition that "the likelihood of the effect on the overall length of prisoner's sentence from a successful § 1983 action determines the availability of habeas corpus" and with Bostic itself.

One year after Ramirez, the court again visited the intersection of habeas and § 1983 in Docken. 393 F.3d at 1026-31. In Docken, as in Bostic, the court reviewed the dismissal of a habeas petition for want of jurisdiction. Id. at 1025, 1026. Unlike Bostic, the petitioner in Docken did not challenge a prison disciplinary finding, but rather the timing of his parole-eligibility reviews. Id. at 1025-26. The district court had concluded that the claim could only be brought under § 1983 rather than habeas, because the plaintiff's success in the case would not "entitle" him to release, just an earlier eligibility review. Id.

In reversing that conclusion, the Court of Appeals discussed at length U.S. Supreme Court and Ninth Circuit precedent. The first conclusion the court drew from that precedent was that, "although Supreme Court law makes clear that § 1983 is not available where

a prisoner's claim 'necessarily' implicates the validity or duration of confinement, it does not set out any mirror-image limitation on habeas jurisdiction." Id. at 1028.  The court, citing Bostic, noted that its own precedent held that habeas jurisdiction was available in some non - "core" circumstances.  See id.  ("In [Bostic], for example, we held that 'habeas corpus jurisdiction . . . exists when a petitioner seeks expungement of a disciplinary finding from his record if expungement of a disciplinary finding from his record is expungement is likely to accelerate the prisoner's eligibility for parole.'").

Importantly, in speaking of claims only "likely to accelerate" eligibility for parole, Bostic defined a class of suits outside the "core" habeas claims identified in Preiser.  Success on the merits in such cases would not "necessarily" implicate the fact or duration of confinement.  Instead, such claims have, at best, only a possible relationship to the duration of a prisoner's confinement, as eligibility for parole is distinct from entitlement for parole.

Id. at 1028-29.

Since these three Ninth Circuit cases outlined in Jackson have been decided, district courts have taken divergent views on whether a claim such as the one that Petitioner raises in Claim III is cognizable in federal habeas proceedings.  Compare, Allen v. Swarthout, Civ. No. 10-3257, 2011 WL 2075713, at *3 (E.D. Cal. May 23, 2011) (finding habeas jurisdiction where petitioner demonstrated that it was "at least 'likely' that expungement of the disciplinary finding could accelerate his eligibility for parole"); report and recommendation adopted by, 2011 WL 2680756 (E.D. Cal. July 8, 2011); Hardney v. Carey, Civ. No. 06-300, 2011 WL 1302147, at *8 (E.D. Cal. Mar. 31, 2011) (same); Drake v. Felker, Civ. No. 07-577, 2007 WL 4404432, at *2 (E.D. Cal. Dec. 13, 2007) ("The Court finds that Petitioner's application is cognizable under 28 U.S.C. § 2254 to the extent it raises concern that the disciplinary finding will one day affect Petitioner's eligibility for parole."); with Norman v. Salazar, Civ. No. 08-8532, 2010 WL 2197541, at *2 (C.D. Cal. Jan. 26, 2010) ("The mere possibility that the 2006 disciplinary conviction could be detrimental to Petitioner in future parole hearings is too speculative to serve as the basis for a habeas corpus petition."), report and recommendation adopted by, 2010 WL

21

2197542 (C.D. Cal. May 26, 2010).  Judge Hollows, citing to relevant authority, recently

determined that the majority of courts considering this issue have found habeas jurisdiction to

exist.  Bailey v. Swarthout, Civ. No. 10-2454, 2011 WL 4056051, at *4 (E.D. Cal. Sept. 12,

2011) (citing Morris v. Haviland, Civ. No. 10-897, 2011 WL 3875708 (E.D. Cal. Sept. 1, 2011);

Allen, 2011 WL 2075713, Hardney, 2011 WL 1302147, Johnson v. Swarthout, Civ. No. 10-

1568, 2011 WL 1585859 (E.D. Cal. Apr. 22, 2011); Foster v. Washington-Adduci, Civ. No. 09-

7987, 2010 WL 1734916 (C.D. Cal. Mar. 24, 2010), report and recommendation adopted by,

2010 WL 1734915 (C.D. Cal. Apr. 27, 2010); Murphy v. Dep't of Corrs. & Rehabilitation, Civ.

No. 06-4956, 2008 WL 111226 (N.D. Cal. Jan. 9, 2008); Drake, 2007 WL 4404432).

However, in Willis v. Grounds, Civ. No. 10-642, (E.D. Cal. Sept. 30, 2011)[3], District

Judge England rejected this view in deciding a motion to dismiss.  In Willis, the petitioner sought

habeas relief from a prison disciplinary proceeding where he lost good time credits as he feared

this hindered his eligibility for parole.  See id. at p. 1.  In analyzing Bostic, Ramirez and Docken,

Judge England stated that:

> The Ninth Circuit, then, has created three arguably different
> standards regarding the availability of federal habeas review for
> expungement of disciplinary proceedings.  Under Bostic, habeas
> jurisdiction is proper if expungement of a disciplinary proceeding
> is "likely to accelerate the prisoner's eligibility for parole."  Bostic,
> 884 F.2d at 1269.  Under Ramirez, habeas is absent "where a
> successful challenge to a prison condition will not necessarily
> shorten the prisoner's sentence."  Ramirez, 334 F.3d at 859.
> Finally, under Docken, habeas jurisdiction is proper when a
> prisoner challenges aspects of his parole review that "could
> potentially affect the duration of [his] confinement."  Docken, 393
> F.3d at 1031.
>
> The holdings have led to inconsistency among district courts
> addressing the existence of federal habeas jurisdiction in prisoner
> claims seeking expungement of prison disciplinary convictions.  In
> particular, Docken appears to create a lower threshold for
> establishing the existence of federal habeas jurisdiction in some
> instances as opposed to the standards articulated in Bostic and

---

[3] A copy of September 30, 2011 order in Willis is attached to this findings and
recommendations.

Ramirez.

Some courts, for example, have applied the <u>Docken</u> standard to cases like the instant case, where a petitioner seeks expungement alleging that a procedure used during a disciplinary proceeding violated his due process rights.  In these cases, habeas jurisdiction has been found to exist because expungement of a disciplinary conviction could potentially affect the duration of a prisoner's confinement.  Indeed, because parole review panels consider prison conduct as a factor in determining parole eligibility, an expungement of a prisoner's disciplinary record could potentially affect his eligibility for parole, and therefore, could potentially affect the duration of his confinement.

The <u>Docken</u> standard for establishing federal habeas jurisdiction, however, is arguably limited to petitioners "challenging aspects of [ ] parole review", such as the timing between parole hearings, and not direct challenges to disciplinary convictions.  <u>Docken</u>, 393 F.3d at 1031 (timing between parole hearings is "even more related to the duration of [ ] confinement than eligibility for parole in the abstract").  <u>Docken</u> specifically dealt with a prisoner's claim with respect to the length of time between parole hearings, whereas in <u>Ramirez</u> and <u>Bostic</u>, the petitioners attacked the disciplinary hearings themselves and the resulting convictions.  Additionally, <u>Docken</u> distinguished <u>Ramirez</u>, stating "[u]nlike this case, <u>Ramirez</u> concerned a challenge to internal disciplinary procedures and administrative segregation that result from it.  Ramirez's suit did not deal with the fact or duration of his confinement."  <u>Docken</u>, 393 F.3d at 1030 n. 4.

Under this reasoning, which this Court hereby adopts, the <u>Ramirez</u> and <u>Bostic</u> standards apply to this case, while <u>Docken</u> does not, because petitioner is attacking the disciplinary procedures and the resulting conviction, not aspects of parole review . . .

<u>Bostic</u> established federal jurisdiction to review expungements where it is likely to accelerate eligibility for parole.  <u>Bostic</u>, 884 F.2d at 1269.  Although a disciplinary conviction will likely be an important consideration to any parole board determination of eligibility, it cannot be said that the conviction would likely accelerate eligibility, because many factors go into determining whether a prisoner is eligible for parole.  <u>See</u> Cal. Code Regs., tit. 15 § 2402(a) (listing eligibility factors considered by parole boards); <u>see also</u> <u>Calderon-Silva</u>, 2010 WL 5392895, at *3 ("[a]lthough a disciplinary conviction may not help an inmate who is seeking release on parole, it is only one of a myriad of considerations relevant to a parole decision").  For example, parole board panels consider

prisoner's social history; past and present mental state; past criminal history, including involvement

23

in other criminal misconduct which is reliably
documented; the base and other commitment
offenses, including behavior before, during and after
the crime; past and present attitude toward the
crime; any conditions of treatment or control,
including the use of special conditions under which
the prisoner may safely be released to the
community.

Cal. Code Regs., tit. 15 § 2402(b).  Panels also consider previous
record of violence, social history, sexual offenses, psychological
factors, and institutional behavior.  Cal. Code Regs., tit. 15 §
2402(c).  The ultimate decision rests on whether "the prisoner will
post an unreasonable risk of danger to society if released from
prison."  Cal. Code Regs. tit. 15, § 2402(a).

Similarly, under <u>Ramirez</u>, even if petitioner is successful on the
merits of his challenge to his disciplinary conviction, expungement
might, but would "not necessarily shorten" his sentence.  <u>Ramirez</u>,
334 F.3d at 859.  The presence of one negative factor may or may
not foreclose a favorable parole determination.
The impact of expunging Petitioner's disciplinary conviction on
parole eligibility, therefore, is simply too speculative to hold
federal habeas jurisdiction exists.  Expungement would not
necessarily shorten his sentence, nor can it be said to be likely to
accelerate his eligibility for parole.

United States Supreme Court precedent provides additional support
for this analysis.  In <u>Sandin v. Conner</u>, 515 U.S. 472, 115 S.Ct.
2293 (1995), a prisoner brought forth a claim arguing that a Hawaii
prison regulation an the Due Process Clause afforded the prisoner a
protected liberty interest such that a disciplinary sentence of 30
days segregation was unconstitutional.  In finding the 30-day
punishment itself constitutional, the court also addressed the
impact of the conviction on his parole eligibility in the future:

Nor does [Petitioner's] situation present a case
where the State's action will inevitably affect the
duration of his sentence.  Nothing in Hawaii's code
requires the parole board to deny parole in the face
of a misconduct record or to grant parole in its
absence, Haw. Rev. Stat. §§ 353-68, 353-69 (1985),
even though misconduct is by regulation a relevant
consideration, Haw. Admin. Rule § 23-700-33(b)
(effective Aug. 1992).  The decision to release a
prisoner rests on a myriad of considerations.  And,
the prisoner is afforded procedural protection at his
parole hearing in order to explain the circumstances
behind his misconduct record.  Haw. Admin. Rule
§§ 23-700-31(a), 23-700-35(c), 23-700-36 (1983).
The chance that a finding of misconduct will alter

the balance is simply too attenuated to invoke the
procedural guarantees of the Due Process Clause.

Id. at 487 (emphasis added); see also Spencer v. Kemna, 523 U.S.
1, 14, 118 S.Ct. 978, 986 (1998) (parole revocation impacting
future parole proceedings is only a "possibility rather than a
certainty or even a probability" as is "simply one factor, among
many, that may be considered by the parole authority in
determining whether there is a substantial risk that the parole
candidate will not conform to reasonable conditions of parole");
Wilson v. Terhune, 319 F.3d 477, 480-81 (9th Cir. 2003) (adopting
Spencer stating "[b]ecause the decision whether to grant parole is
left to the judgment of the Board of Prison terms, Cal. Code Regs.
Tit. 15 § 2402, the likelihood of delayed or denied parole is a type
of nonstatutory consequence dependant on discretionary decisions
that is insufficient to apply the presumption of collateral
consequences").

As the Supreme Court has recognized, parole determinations can
rest on any number of different factors.  Consequently, federal
habeas jurisdiction to review Petitioner's claim for expungement is
absent under the facts of this case.

Willis, slip op. at p. 6-11 (footnote omitted).

Thus, there is a split even within the Eastern District of California regarding whether habeas jurisdiction exists over Petitioner's Claim III.  Nevertheless, under either rationale Petitioner is not entitled to federal habeas relief under Claim III.

First, following Judge England's reasoning in Willis, there would be no federal habeas jurisdiction over Claim III.  Petitioner's Claim III seeks similar relief as did the Petitioner in Willis.  Petitioner seeks expungement of a prison disciplinary proceedings so that they do not hinder his eligibility for parole,.  Accordingly, following Judge England's reasoning, federal habeas jurisdiction would be lacking under Claim III and Petitioner would not be entitled to federal habeas relief under this Claim.

Alternatively, if there is habeas jurisdiction over Claim III as many courts have so found, then Petitioner still would not be entitled to federal habeas relief.  In determining whether to release Petitioner on parole at any future parole hearing, the Board considers these violations because it reflects on Petitioner's behavior after the crime.  See 15 Cal. Code Regs. § 2402(b).  In

1    this case, the Board specifically noted Petitioner's prison disciplinaries as a reason for denying

2    him parole at the September 2008 parole eligibility hearing.  The possible expungement of

3    Petitioner's two disciplinary findings could accelerate Petitioner's eligibility for parole.

4    Therefore, under these circumstances the applicability of the two disciplinary findings may be

5    significant enough to warrant federal habeas review if there is in fact federal habeas jurisdiction

6    over this Claim.

7            With respect to the first violation, the correctional officer stated that the mailroom

8    received a priority mail box from David Petersen, Attorney at Law, SBN241965.  The box was

9    addressed to Petitioner.  The correctional officer stated that the state bar number was checked

10   against the State Bar website and did not match and the address for Mr. Petersen was incorrect.

11   Becoming concerned that the box might contain contraband, the correctional officer opened the

12   box and and discovered that the box contained a contract between Petitioner and an individual

13   named Alicia Newman-Cole.  The officer discovered that Petitioner operates/owns a paralegal

14   business for hire and attracts potential clients through a website which charges $500 for services.

15   (See Pet'r's Pet. Ex. K.)  Based on this evidence, Petitioner was found guilty of business dealing

16   by an inmate.  He received thirty days loss of good time credits.  (See id.)

17           With respect to the second rules violation, the Rules Violation Report (RVR) indicated

18   that the correctional officer received an envelope from Petitioner to Mrs. Mahbooba N.

19   Saif'ullah.  The correctional officer explained that, "[i]nside the envelope were documents that

20   outlined a case for Alicia Newman-Cole.  This is a known case being worked on by "The Peoples

21   Paralegal Services.  It is also know that [Petitioner] operates and/or owns this paralegal business

22   for hire.  The manila envelope with contents was returned to [Petitioner], with a CDC-1819

23   'Notification of Disapproval.'" (Pet'r's Pet. Ex. M.)  In finding the Petitioner guilty of this

24   offense, the findings indicated that the evidence included:  (1) the RVR which included the

25   correctional officer's statement; (2) "[w]eb site printout depicting the business name "The

26   Peoples Paralegal Services.  This document also contains the name Khalifah E.D. Saif'ullah

1  listing his credentials as a paralegal and also contains legal assistance price list; [(3)] Contractual

2  agreement for the Peoples Paralegal Services listing the name and address of Khalifah E.D.

3  Saif'ullah and Mohoobah Nasher Mojaddidi which states in part we, The Peoples Paralegal

4  Services hereby establish a contractual agreement with Alica Norman-Cole [sic]; [(4)] Court

5  prepared documents for Alicia Newman Cole being sent form [sic] [Petitioner] to Mahooba N.

6  Mojaddidi/Saif'ullah." (Id.)

7      Petitioner argues that these findings were in error because by opening his mail on these

8  occasions, his First and Sixth Amendment rights were violated.  Where a prison disciplinary

9  hearing may result in the loss of earned good time or behavior credits, due process requires that

10  the inmate receive certain procedural protections.  First, "written notice of the charges must be

11  given to the disciplinary-action defendant in order to inform him of the charges and to enable him

12  to marshal the facts and prepare a defense." Wolff v. McDonnell, 418 U.S. 539, 564 (1974).

13  Second, "at least a brief period of time after the notice, no less than 24 hours, should be allowed

14  to the inmate to prepare for the appearance before the [disciplinary] committee." Id.  Third,

15  "there must be a written statement by the factfinders as to the evidence relied on and reasons for

16  the disciplinary action." Id. (internal quotation marks and citation omitted).  Fourth, "the inmate

17  facing disciplinary proceedings should be allowed to call witnesses and present documentary

18  evidence in his defense when permitting him to do so will not be unduly hazardous to

19  institutional safety or correctional goals." Id. at 566.  Fifth, "[w]here an illiterate inmate is

20  involved . . . or where the complexity of the issues makes it unlikely that the inmate will be able

21  to collect and present the evidence necessary for an adequate comprehension of the case, he

22  should be free to seek the aid of a fellow inmate, or . . . to have adequate substitute aid . . . from

23  the staff or from [a]n . . . inmate designated by the staff." Id. at 570.

24      Claim III does not relate to these procedural protections, instead, Petitioner attacks the

25  evidence that was used against him during the rules violation hearing as being obtained in

26  violation of the First Amendment and his attorney-client privilege rights.  The disposition of a

27

1   prison disciplinary hearing must be supported by "some evidence" in the record.  See

2   Superintendent, Mass. Corr. Institution, Walpole v. Hill, 472 U.S. 445, 455 (1985).  The "some

3   evidence" standard is "minimally stringent" and a decision must be upheld if there is any reliable

4   evidence in the record that could support the conclusion reached by the fact finder.  See Powell v.

5   Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir.

6   1987)).  Determining "whether this standard is satisfied does not require examination of the

7   entire record, independent assessment of the credibility of witnesses, or the weighing of

8   evidence."  Hill, 472 U.S. at 455-56.  Furthermore, "[r]evocation of good time credits is not

9   comparable to a criminal conviction, and neither the amount of evidence necessary to support

10  such a conviction, nor any other standard greater than some evidence applies in this context."  Id.

11  at 456.

12         Here, the evidence as stated in the RVRs indicated that there was "some evidence" to

13  support the finding that Petitioner was involved in impermissible business dealings.  Petitioner

14  does not contest that the contents of the mail seized did in fact indicate that he was engaged in

15  business dealings in violation of the applicable regulations.  Instead, Petitioner argues that the

16  evidence should have never been admitted in the first place because the evidence was

17  unconstitutionally seized.  Petitioner invokes the exclusionary rule in this argument.  However,

18  Petitioner's invocation of the exclusionary rule does not merit granting federal habeas relief on

19  this Claim.  As one court has noted:

20         The exclusionary rule, a judicially created rule, was developed as a
           remedy for Fourth Amendment violates by law enforcement.  It
21         provides that, if officers obtain evidence through an illegal search
           or seizure, then in a criminal prosecution, that evidence cannot be
22         admitted at trial.  This rule, however, has "never been interpreted
           to proscribe the introduction of illegally seized evidence in all
23         proceedings or against all persons."  Stone v. Powell, 428 U.S.
           465, 486 (1976).
24
           In its decision in Pennsylvania Board of Probation and Parole v.
25         Scott, the U.S. Supreme Court considered whether the exclusionary
           rule should apply in parole revocation hearings.  See 524 U.S. 357
26         (1988) (5-4 decision).  It opened its analysis by noting that it had

1    "repeatedly declined" to apply the rule in proceedings other than
     criminal trial.  See id. at 363.  The Court ultimately decided that
2    the exclusionary rule did not apply to parole revocation hearings.
     Id. at 364.
3
     In support of this result, the Court outlined several factors.  In part,
4    it noted the informal nature of parole revocation proceedings and
     expressed concern that the exclusionary rule would impose undue
5    administrative burdens on parole officials.  Id. at 364-67.  It added
     that parole is incident to imprisonment, and for this reason, the
6    interest in protecting the public from convicted felons strongly
     militates against the exclusionary rule in that context.  Id. at 365.
7    This reasoning has equal or greater force in prison disciplinary
     proceedings.  Like parole revocation proceedings, the disciplinary
8    hearing is a less formal, administrative procedure.  And if the
     exclusionary rule applied, it would substantially increase the
9    complexity of disciplinary proceedings, imposing significant costs
     and restraints on prison officials.  In these circumstances, and in
10   accordance with the reasoning in Scott, the exclusionary rule
     cannot be applied to prison disciplinary proceedings.
11

12   Stanko v. Rios, Civ. No. 2009 WL 1066021, at *3 (D. Minn. Apr. 20, 2009), aff'd, 366 Fed.

13   Appx. 706 (8th Cir. Feb. 23, 2010); see also Fuller v. Washington County Hosp., Civ. No. 05-

14   2333, 2006 WL 4571279, at *4 (D. Md. May 23, 2006) ("[M]anagement of prisons is left to the

15   expertise of those in charged with the difficult task of overseeing the daily operations of the

16   facilities.  It is not the role of the courts to determine prison security matters, and the

17   exclusionary rule does not apply to prison disciplinary proceedings."), aff'd, 207 Fed. Appx. 302

18   (4th Cir. Nov. 30, 2006); cf. Davis v. United States, 131 S.Ct. 2419, 2432 (2011) ("We have also

19   repeatedly rejected efforts to expand the focus of the exclusionary rule beyond deterrence of

20   culpable police conduct.") (emphasis added); Scott, 524 U.S. at 359, 363 (recognizing the

21   repeated denials of extending the exclusionary rule to proceedings other than criminal trials and

22   holding that the exclusionary rule will not be extended to parole revocation proceedings).

23          In this case, the evidence seized implicated Petitioner in improperly engaging in operating

24   a business in violation of prison rules and regulations as stated in the RVRs.  Petitioner does not

25   contest that the items seized did not implicate him as such.  Petitioner does not show that the

26   exclusionary rule applies to prison disciplinary proceedings by citing to clearly established

1   federal law as stated by the Supreme Court.  The denial of this Claim did not amount to an

2   unreasonable application of clearly established federal law.  Therefore, Petitioner is not entitled

3   to federal habeas relief on this Claim.[4]

4                                   V.  PETITIONER'S REQUESTS

5         A.  Order to Show Cause

6         Petitioner requests an order to show cause.  Respondent answered the petition on April 1,

7   2010.  Therefore, this request will be denied as moot.

8         B.  Appointment of Counsel

9         Next, Petitioner requests the appointment of counsel.  There currently exists no absolute

10  right to the appointment in habeas proceedings.  See, e.g., Nevius v. Sumner, 105 F.3d 453, 460

11  (9th Cir. 1996).  However, 18 U.S.C. § 3006A authorizes the appointment of counsel at any stage

12  of the case "if the interests of justice so require."  In the present case, the interests of justice do

13  not so require to warrant the appointment of counsel.  Accordingly, Petitioner's request for the

14  appointment of counsel is denied.

15        C.  Evidentiary Hearing

16        Petitioner also requests an evidentiary hearing.  A court presented with a request for an

17  evidentiary hearing must first determine whether a factual basis exists in the record to support

18  petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."  Baja v.

19  Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166

20  (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has

21  presented a "colorable claim for relief."  Earp, 431 F.3d at 1167 (citations omitted).  To show

22  that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would

23  entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation

24

25        [4] It is also worth noting that at least with respect to the second disciplinary finding, it did
    not even relate to purported communications between Petitioner and his attorney but was a letter
    purportedly addressed from Petitioner to his wife.  Thus, contrary to Petitioner's argument, it
26  would not implicate any of Petitioner's purported attorney-client privilege rights.

1   marks and citation omitted).  In this case, an evidentiary hearing is not warranted for the reasons

2   stated in <u>supra</u> Part IV.  Petitioner failed to demonstrate that he has a colorable claim for federal

3   habeas relief.  Moreover, the Supreme Court has recently held that federal habeas review under

4   28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated

5   the claim on the merits" and "that evidence introduced in federal court has no bearing on" such

6   review.  <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1398, 1400 (2011).  Thus, his request will be

7   denied.

8          D.  Judicial Notice

9          Petitioner first requests judicial notice of a notice by the Board of Parole Hearings for a

10   proposal regarding psychological risk assessments for life inmates.  (<u>See</u> Dkt. No. 21.)  Petitioner

11   attaches this document as Exhibit A to Dkt. No. 21.  Within this request, Petitioner also requests

12   judicial notice of a determination by the State of California Office of Administrative Law issued

13   in 2010 which concerns the Board's psychological evaluation process for inmates prior to life

14   parole consideration hearings.  He attaches that determination as Exhibit B to Dkt. No. 21.

15   Finally, Petitioner requests judicial notice of a decision of disapproval of regulatory action by the

16   State of California Office of Administrative Review.  (<u>See</u> Dkt. No. 22.)

17          Federal Rule of Evidence 201(b) states that "[a] judicially noticed fact must be one not

18   subject to reasonable dispute in that it is either (1) generally known within the territorial

19   jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to

20   sources whose accuracy cannot reasonably be questioned."  The Ninth Circuit has explained that

21   a court can take judicial notice of records and reports of administrative bodies.  <u>See</u> <u>Interstate</u>

22   <u>Nat. Gas Co. v. Southern Cal. Gas Co.</u>, 209 F.2d 380, 385 (9th Cir. 1954).  Thus, Petitioner's

23   requests for judicial notice of the decision and determination from the Office of Administrative

24   Law will be granted.  Additionally, Petitioner's request for judicial notice of the notice of the

25   Board's proposal will be granted.  <u>Cf.</u> <u>N.W. Envtl. Advocates v. EPA</u>, 537 F.3d 1006, 1026-27

26   (9th Cir. 2008) (taking judicial notice of items within EPA's request for comments in forming a

new regulation); <u>Robinson v. Midland Funding, LLC</u>, Civ. No. 10-2261, 2011 WL 1434919, at

*2 (S.D. Cal. Apr. 13, 2011) (taking judicial notice of notice or proposed rulemaking of rules and

and regulations implementing the Telephone Consumer Protection Act of 1991); <u>see</u> <u>also</u> <u>United</u>

<u>States v. S. Cal. Edison Co.</u>, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) ("a court may take

judicial notice of the existence of certain matters of public record").

VI.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1.  Petitioner's request for an order to show cause is DENIED AS MOOT;

2.  Petitioner's request for the appointment of counsel is DENIED;

3.  Petitioner's request for an evidentiary hearing is DENIED; and

4.  Petitioner's requests for judicial notice (Dkt. Nos. 21 & 22) of (1) the Board's
    notice of proposed rulemaking regarding psychological risk assessments for life
    inmates, (2) the determination by the Office of Administrative Law concerning the
    Board's psychological evaluation process for inmates prior to life parole
    consideration hearings, and (3) the decision of disapproval of regulatory action
    from the State of California Office of Administrative Law is GRANTED.

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for

writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within seven days after service of the objections.  The parties are

advised that failure to file objections within the specified time may waive the right to appeal the

District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

1  elects to file, Petitioner may address whether a certificate of appealability should issue in the

2  event he elects to file an appeal from the judgment in this case.  <u>See</u> Rule 11, Federal Rules

3  Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

4  when it enters a final order adverse to the applicant).

5  DATED:  October 31, 2011

6

7

8

9                                    TIMOTHY J BOMMER
                                     UNITED STATES MAGISTRATE JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26